71 A.3d 251

**In re T.S.M., A Minor.**

**Appeal of T.S.M., A Minor.**

**In re T.R.M., A Minor.**

**Appeal of T.R.M., A Minor.**

**In re T.J.M., A Minor.**

**Appeal of T.J.M., A Minor.**

**In re T.A.M., A Minor.**

**Appeal of T.A.M., A Minor.**

**In re N.D.M., A Minor.**

**Appeal of N.D.M., A Minor.**

Supreme Court of Pennsylvania.

Submitted June 5, 2013.

Decided July 22, 2013.

604

Amy Lynn Berecek, Esq., Pittsburgh, for T.S.M., T.R.M., T.J.M., T.A.M., and N.D.M.

Lucille J. Johnston Walsh, Esq., Penn State Dickinson School of Law, Timothy Patrick Smith, Esq., Pittsburgh, for Penn State University Dickinson School of Law Children's Advocacy Clinic, Support Center for Child Advocates, Pennsylvania CASA Association, CASA of Allegheny County, National Association of Social Workers, and Dependency Division of the Allegheny County Office of Conflict Counsel.

Lilian Alexa Akin, Esq., Pittsburgh, Allegheny County Office of Children, Youth and Families.

Kiersten M. Frankowski, Esq., Allegheny County Bar Foundation Juvenile Court Project, for T.R.M.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, JJ.

## OPINION

Justice BAER.

We granted review in this case involving petitions for termination of parental rights for five siblings to consider how trial courts should weigh the existence of "pathological" emotional bonds between parents and children. This family of seven children, the five youngest of whom are before the Court, epitomizes the problem of foster care drift, as the family has been involved with the Allegheny County Office of Children, Youth, & Family Services ("CYF") for nearly a decade, and each child has had between six and thirteen foster placements. As a result, the children have been denied necessary permanency, and most are experiencing significant psychological and behavioral problems. This case exemplifies the challenges facing the foster care system when children have understandably strong, even if unhealthy, bonds to biological parents who

have proven incapable of parenting. Courts must determine whether the trauma caused by breaking that bond is outweighed by the benefit of moving the child toward a permanent home. After exhaustive review and consideration, we conclude that severing the parental bond best serves the needs and welfare of these children and accordingly reverse the decisions of the courts below denying the petitions for termination of parental rights and remand for further proceedings not inconsistent with this decision.

T.M. ("Mother") has seven children: a daughter Tad. M., currently fourteen, a son Tam. M., currently thirteen, male twins, Ti. M. and Tai. M., who turn twelve this summer, a son Ty. M., currently ten, a son N.M., who turns eight this summer, and a son Tae. M., currently six.[1] CYF became involved with the family in 2001. In February 2002, the oldest four children were removed from Mother's care and placed with the maternal grandmother.[2] The removal followed a life-threatening injury to then-six month old Tai. M., requiring emergency neurosurgery. While Mother claimed the injury resulted from a fall off of a bed, the treating doctors concluded that the injury was inconsistent with a fall. By August 2003, the children were reunited with Mother, and the case seemingly closed in May 2004.

In May 2006, a dependency petition was filed relating to Ty. M., with a dependency hearing scheduled for August 2006. From information contained in the termination of parental rights petitions, Ty. M. apparently had a large scratch and

1. The trial court and Superior Court used different abbreviations for the children's names. We will utilize the abbreviations of the trial court for convenience.

   The factual recitation includes information from orders in the children's dependency proceedings, which were conducted pursuant to the Juvenile Act, 42 Pa.C.S. § 6301, *et seq.* The orders, however, were admitted into evidence in the termination proceedings in the case at bar conducted under the Adoption Act, 23 Pa.C.S. § 2101, *et seq.*, and are therefore part of the record before us.

   We note that the trial judge, who heard all of the termination proceedings, including those currently before us, also presided over the dependency proceedings regarding these children beginning in 2008.

2. The youngest three had not been born in February 2002.

bump on his forehead and bites on his face. In July 2006, the then-youngest child, one-year-old N. M., was taken to the emergency room after nearly drowning while Tad. M., who was then seven, bathed him. On July 19, 2006, the court removed the six children from Mother's care and placed them with the maternal grandparents. When Tae. M. was born in November 2006, he was placed in a foster home upon discharge from the hospital.[3] By the summer of 2007, the six children in the maternal grandmother's custody were removed and placed in foster homes. The oldest child, daughter Tad. M., then eight years old, was returned to Mother's care prior to November 2007, while the other six remained in foster care.

The current trial judge first became involved in the case in April, 2008. At that point, the court found that Mother was making substantial progress toward her FSP goals. The court ordered that daughter Tad. M. remain in Mother's custody; twins Tai. M. and Ti. M. be reunited with Mother; but Tam. M., Ty. M., N. M., and Tae. M. remain in foster care. In July of 2008, the placements remained the same, despite the fact that four of the children had been in foster care for well over fifteen of the prior twenty-two months.[4] In August

3. CYF asserted in the termination petition that Tae. M. was removed from Mother's care at birth because Mother tested positive for marijuana when Tae. M. was born, had not received pre-natal care until a month prior to the birth, and was not in compliance with her family service plan ("FSP") goals.

4. The Juvenile Act requires the court to determine at each permanency hearing, *inter alia:*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:
(i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
(ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or

2008, the children's placement remained the same, except the court returned Tam. M. and Tae. M. to Mother's custody. In January 2009, two days prior to a scheduled review hearing, the children in Mother's care were removed after "the children disclosed that Mother whoops them with belts and hangers, smokes weed and [they] had witnessed Mother and paramour having sexual relations." Tr. Ct. Op., 5/7/12, at 4 (internal quotations omitted) ("Tr.Ct.Op.").

In February 2009, CYF and the children's Guardian Ad Litem ("GAL") filed a petition to change the children's permanency goal from reunification to adoption. After two hearings, the trial court denied the petition in March 2009, based upon the psychologist, Dr. Cathy Sigmund's testimony regarding a "strong family bond and attachment" and her request for additional information before making recommendations for permanency goals. Tr. Ct. Op. at 7. The court asserted that a goal change was "against the weight of the existing evidence as to best interests of the children in that the children had no meaningful relationship with any adult other than their mother, they were living with total strangers, and most significantly, they were clearly bonded as a family." Tr. Ct. Op. at 7. The GAL appealed the decision to the Superior Court. While the appeal was pending, the trial court regularly reviewed the children's cases, determining that continued out-of-home placement was necessary, and ordering CYF to employ Family Finding and Family Group Decision Making[5] for all seven children in 2009.[6]

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.
42 Pa.C.S. § 6351(f).

5. Family Finding is "[a] process used to identify family members (included extended family)" "[i]n an effort to provide permanent placements, supports and safe, adult connections for youth." Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook*, "Glossary and Acronyms" at 212 (2010). Family Group Decision Making is "a method of bringing family members together to reach a consensus on a recommendation to the court for a safe and permanent plan for a child." *Id.*

6. The trial court had to issue repeated orders to CYF to obtain its compliance in referring the case to Family Group Decision Making,

In February 2010,[7] the Superior Court reversed the decision of the trial court concluding that "there can be no purpose served by continuing to work to reunite the family." *In re: N.M.*, No. 520–523 WDA 2009, unpublished memorandum at 30 (Pa.Super.Feb. 19, 2010). The Superior Court took notice of the numerous foster care and group home placements for the children, the provision of at least ten services to Mother to assist her in achieving her FSP goals, noting that "all of the services expressed concern about Mother's non-compliance and ability to safely supervise and care for all seven of her Children." *Id.* at 13–14. The court listed a litany of occasions when the children were in Mother's custody and she failed or refused to obtain necessary education, medical, and mental health care for them, which was especially concerning given that several of them suffered from mental health disorders. The court also noted Mother's continued drug use, including several missed tests and two positive tests preceding the goal change hearing. The court also addressed a then-recent report that Mother's paramour was being investigated for sexually abusing Tad. M. The Superior Court recognized that a bond existed between the children and Mother, but opined that "the bond between a parent and a child is only one factor to consider . . . in making a decision regarding a goal change." *Id.* at 27. It further noted that the parent-child relationship may be "destructive and therefore not in the child's best interest." *Id.* Accordingly, the Superior Court reversed the trial court's denial of goal change, and the permanency goals were changed to adoption in the spring of 2010.

In August 2010, CYF filed termination petitions under 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b)[8] relating to all seven

which the trial court correctly noted this Court has adopted as a best practice.

7. For unexplained reasons, the Superior Court did not decide this case until February 2010, nearly a year after it was appealed. Respectfully, we view this lapse seriously, as it caused extremely at-risk children to remain in stasis for a substantial, unnecessary time period.

8. § 2511. Grounds for involuntary termination

children, for which we will only discuss the five children before this Court.[9] As to all of the children, CYF alleged that Mother failed to comply with her FSP goals in that she had not completed her drug and alcohol, anger management, and mental health treatments. CYF asserted that, while Mother obtained housing, safety issues still remained because Mother allowed certain individuals access to the house. CYF also maintained that Mother had not worked cooperatively with the

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

9. CYF also filed for termination of the children's fathers' parental rights, which the trial court granted. As the fathers have not appealed those orders, we will not address facts relating to the fathers, who have not been present in the children's lives.

in-home services. It additionally expressed concern that Mother continued to deny having physically abused the children despite overwhelming evidence to the contrary. Additionally, CYF alleged that Mother had not been fully cooperative with the children's medical and mental health treatment and educational appointments.

Turning to the individualized information, the petition for termination of parental rights of Tai. M., filed in August, 2010, alleged that he came into the care of CYF in July 2006, days after his fifth birthday, and was adjudicated dependent in August 2006. He had been out of Mother's care since then with the exception of nine months between April 2008 and January 2009. CYF asserted that Tai. M. "continually had difficulty while in [M]other's care due to her refusal to accept wrap around services."[10] Tai. M. Termination of Parental Rights Petition ("TPR Petition") at ¶ 7. The petition also averred that Tai. M. acted out sexually in Mother's care and that Tai. M. alleged that she and her paramour hit the children with belts, smoked marijuana, and allowed the children to have alcohol. Tai. M. also claimed to have regularly witnessed his mother and her paramour having sex.

CYF also filed a petition for termination regarding Tai. M.'s twin, Ti. M., alleging that he too came into the care of CYF in July 2006, was adjudicated dependent in August 2006, and had been out of Mother's care since then with the exception of nine months between April 2008 and January 2009. The petition indicated that Ti. M. "had difficulty while in [M]other's care due to her refusal to accept wrap around services." Ti. M. TPR Petition at ¶ 7. Additionally, it maintained that he acted out sexually in her care and that the children asserted that she and her paramour hit them with belts, smoked marijuana and had sex regularly in their presence.

The August 2010 petition for termination of Ty. M.'s parental rights asserted that he was removed from Mother in July 2006 after he presented with a large scratch and bump on his

10. Wrap around services are behavioral and mental health services provided in the home or school to allow children to remain in the home.

forehead and bites on his face and after N.M.'s near drowning. He was adjudicated dependent in August 2006. He had not been returned since his initial removal. CYF later submitted a Report of Intention to Adopt by Ty. M.'s foster mother.

CYF also filed a petition for termination for N.M., emphasizing that he was removed from Mother's care in July 2006, and had not been returned to her care since. He was adjudicated dependent in August 2006. Additionally, the record includes a Report of Intention to Adopt by N.M.'s foster mother.

Finally, CYF filed an August 2010 termination petition for Tae. M., recounting that he was placed in foster care at birth because Mother tested positive for marijuana when Tae. M. was born, had not received pre-natal care until a month prior to the birth, and was not in compliance with her FSP goals related to Mother's other children. He was adjudicated dependent in April 2007. He had been out of Mother's care for his entire life other than a period of five months from August 2008–January 2009, and during that brief period of time CYF received reports that he, at age two, was found on the street without an adult. CYF additionally submitted a Report of Intention to Adopt by Tae. M.'s foster mother.[11]

As discussed below, the court did not hold hearings on these Petitions for Termination of Parental Rights until April 2011.[12] In the interim, the court issued a permanency review order in October 2010, in which it found that Mother had made "moderate progress" toward her FSP goals.[13] The court emphasized that the psychologist, Dr. Patricia Pepe, did not recom-

11. Tae. M.'s foster mother became seriously ill during the termination of parental rights proceedings and Tae. M. had to be transferred to a different foster home. He was later placed with a maternal cousin. Permanency Review Order, 4/4/11, at 3.

12. An eight month delay between the filing of a termination petition and the initiation of a hearing thereon, without some explanation, is inconsistent with the best practices for dependent children in need of permanency.

13. As will be discussed later in this opinion, "moderate progress" by a parent is not acceptable when children have been involved in the CYF system for a decade and in foster care for most of the prior five years.

mend a goal change to adoption because successful adoption placement was unlikely given the magnitude of the children's psychological and behavioral issues.[14]

While the termination petitions were pending, the trial court issued orders for the children to attend Family Group Decision Making Conferences and mandated additional Christmas and birthday visits with Mother. During one visit, Mother apparently forced the oldest child to call Mother's paramour, the child's alleged sexual abuser, which the psychologist found to demonstrate "very poor judgment" by Mother. Report of Dr. Pepe, 12/10–2/11, at 19.[15]

In December 2010, CYF and the GAL filed emergency motions requesting that the court schedule six full days of hearings on the termination petitions in March and April 2011. As discussed below, hearings were held on April 27, May 4, May 11, June 22, August 17, August 31, October 12, and November 23. In the interim, the trial court held permanency review or reasonable efforts hearings in February, April, and July, at which the court again concluded that Mother had made "moderate progress" in achieving her plan goals and that CYF had made reasonable efforts to eliminate the need for continued placement.[16] Additionally, the court interviewed the children *in camera* and found that they all expressed a wish to visit Mother and siblings more frequently and dis-

14. This conclusion, which was also offered by the same expert at the termination proceedings, is a classic Catch–22. The court was being advised to delay a goal change to adoption for fear that the children could not be adopted due to their psychological and behavioral issues. The alternative, however, has the potential of increasing the children's disorders through the delay in achieving permanence, making the children even less likely to be adopted. Courts must be ever vigilant against the dangers of delay for children in the foster care system.

15. In March 2011, the court specifically ordered no contact of any kind between the daughter and Mother's paramour who had allegedly sexually assaulted her. The no contact order was extended to all the children in July 2011.

16. During this time period, the court additionally ordered CYF to provide the children transportation to family therapy on a weekly basis and ordered meetings for determination of a concurrent permanency plan.

played a "significant bond" to Mother and desired reunification. Permanency Review Order, 7/27/2011, at 1.

The trial court denied the termination petitions in January 2012. Following the GAL's timely appeal, the trial court issued its opinion in May 2012. In discussing the case, the trial court analogized to the movie "The Blind Side," which depicted Michael Oher experiencing foster care drift before being adopted by a family and developing into a professional football player for the Baltimore Ravens. The trial court emphasized two scenes. The first scene involved a conversation between the biological mother and the adoptive mother, where the biological mother warned that Michael had run away from every prior foster home to come back to her, which the trial court viewed as evidence of dependent children's strong bond with their biological families. The second scene involved a dinner at the adoptive family home where the adoptive father asked if Michael would like to become part of their family and for him and his wife to become Michael's legal guardians. Michael responded that he thought he already was part of the family. The trial court viewed this scene as evidence of the benefits of a permanent, loving adoptive home and the insignificance of the legal designations of termination and adoption to the child. The court opined, "The reality [is] that children in stable, loving homes foster or adoptive, understand[ab]ly still want to see their families, and we as child welfare courts should recognize and develop both relationships." Tr. Ct. Op. at 18.[17]

The trial court additionally spoke to the goals of the foster care system since enactment of the federal Adoption and Safe

---

17. The analogy is inapt. As depicted in the movie, Michael Oher's mother's prediction that he would run back to her proved inaccurate. As the trial court further recounted, he viewed himself as part of his adoptive family. While it is true that, according to the script, Michael sought out his mother at points in the movie, he rejected his prior (destructive) life, once the opportunity to join a loving, stable family presented itself. Moreover, we respectfully reject the trial court's reliance on a Hollywood script to inform termination decisions. Instead, we are guided by the multiple federal and state legislative enactments promoting permanence for children in the foster care system.

Families Act of 1997 ("ASFA"), P.L. 105–89, which focused on abating foster care drift by expediting permanent placement of children. The court asserted, albeit incorrectly as discussed below, "that the ultimate exception to ASFA time frames should be until a child finds meaningful, loving relationships with a family and committed homes are established." Tr. Ct. Op. at 19. While the trial court may have misinterpreted the exception to ASFA time frames, the court correctly articulated the importance of moving from an adversarial approach toward a family-based process and the use of less traditional forms of permanent placements such as permanent legal custodianship, kinship care, or open adoptions.

The trial court next addressed the first of the GAL's challenges, relating to application of the law of the case doctrine, the legal analysis of which is not relevant to the issues before this Court. Notable for our analysis, the GAL based part of its argument on the contention that the trial court erred in continuing to order services for Mother following the Superior Court's order changing the permanency goals to adoption. In response, the trial court opined that under the policy of concurrent planning, services are not automatically cut off upon a change of goal to adoption. It read our recent decisions in *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179 (2010), and *In re S.E.G.*, 587 Pa. 568, 901 A.2d 1017 (2006), as deemphasizing the terminology of the permanency goal and instead emphasizing a need to find a permanent home for the children through concurrent planning. The trial court cited to our holding that "concurrent planning is encouraged because it both protects the child from foster care drift by allowing agencies to consider adoptive resources (including kinship care) while keeping alive the potential of reunification." Tr. Ct. Op. at 21 (quoting *R.J.T.*, 9 A.3d at 1191). It criticized CYF for standing in the way of concurrent planning by not following the trial court's orders directing that Family Group Decision Making conferences occur.

The court next addressed the GAL's assertion that the court abused its discretion in denying termination of parental rights under 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). The court

noted that it found that CYF had proven the elements for termination of parental rights under (a)(2) (repeated and continued incapacity, abuse, neglect or refusal of the parent that cannot be remedied by parent) by the necessary clear and convincing evidence. Additionally, the court found that CYF had proven by clear and convincing evidence most of the elements of (a)(5) (removal of child for at least six months and parent cannot or will not remedy the conditions within a reasonable period of time, and that termination served the needs and welfare of the child) and (a)(8) (twelve months or more have elapsed from the date of placement, conditions leading to removal continue to exist, and termination serves the needs and welfare of the child). However, and important-ly, the court concluded that CYF had not clearly and convinc-ingly proven that termination best served the needs and welfare of the children in this case as required under Section 2511(b), as well as subsections (a)(5) and (a)(8).

Turning to its analysis of the needs and welfare of the children, the trial court opined, "The most clearly convincing evidence in this case is the family's attachment and bonding to each other." Tr. Ct. Op. at 25. The court minimized Dr. Pepe's assertion that the bonds in this case were pathologi-cal,[18] emphasizing that she had not described them as such in any of the prior thirty to forty evaluations.[19] Tr. Ct. Op. at 27.

18. While Dr. Pepe did not specifically define the term "pathological" bonding, she described it as an "unhealthy" bond involving fear and love that occurs when children have been traumatized or abused by a parent, but the children "normalize the dysfunctional behavior[/]dan-gerous parenting" and continue to have a "very close alignment with a parent." Notes of Testimony ("N.T."), 4/27/11, at 235–237. She com-pared the bonds to those that victims of domestic abuse have with their abuser. She notes that despite the abuse, children continue to depend on the adult. N.T., 6/22/11, at 45–46. The description encompasses a spectrum of bonding that has unhealthy or traumatic aspects.

19. It is distressing that the children have undergone thirty to forty evaluations as this case has dragged on for the better part of a decade. Our federal and state lawmakers did not have such proceedings in mind when the passed multiple statutes aimed at quickly moving children into permanent placements, including ASFA, Child and Family Services Improvement and Innovation Act of 2011, P.L. 112–34, Fostering Connections to Success and Increasing Adoptions Act of 2008, P.L. 110–351, and the corresponding amendments to Pennsylvania's stat-

The court asserted that Dr. Pepe recommended family therapy to counter the pathological aspects of the bond. The court also observed that several foster parents remarked that they did not want the child to view them as the cause of severing the bond with Mother. Instead, the court noted that all the parents, with the exception of the foster parent for N.M., were willing to have an open adoption with Mother. According to the court, CYF failed to prove that irreparable harm would not befall the children if the relationship with Mother were severed. The court emphasized the need to maintain the children's bonds with each other. It concluded that the children's bonds to Mother and to each other counseled in favor of not terminating parental rights and instead for providing for open adoptions or subsidized permanent legal custody.

The trial court also expressed concern with terminating parental rights in the absence of current adoptive resources. The court emphasized that CYF's petitions in this case were "contrary to their long standing policy against the creation of legal orphans." Tr. Ct. Op. at 11. The court similarly noted that Dr. Pepe expressed concern that "having the status of an orphan is very psychologically difficult for children." Tr. Ct. Op. at 30 (quoting N.T., 4/27/2011, p. 134). The court suggested that the only reason for CYF to diverge from its standard policy in this case was its "acrimonious history with Mother." Tr. Ct. Op. at 31. The court concluded that CYF failed to prove clearly and convincingly that it would best serve the needs and welfare of the children to terminate Mother's parental rights.[20]

utes. We expect our trial courts to control these proceedings, focus the issues, direct the testimony, and decide matters. Permanency for the children demands no less.

**20.** The court additionally addressed a separate issue related to its consideration of prior testimony of the children and a dependency transcript from a July 2011 hearing that were not admitted into evidence. The court again responded to similar arguments in a supplemental opinion in October 2012. These issues are not before this Court.

In January 2013, a divided three judge panel of the Superior Court affirmed the trial court's decision.[21] The majority, without any additional analysis, affirmed the denial of termination and adopted the trial court's decisions as its own. Judge Bowes filed a lengthy dissent addressing two of the GAL's issues on appeal: whether the trial court erred in disregarding the Superior Court's goal change decision by intensifying the services provided to Mother and whether the trial court abused its discretion in denying termination. *In re T.M.E.S.*, No. 192–198 WDA 2012, unpublished memorandum at 3 (Pa.Super. Jan. 23, 2013) (Bowes, J., dissenting) (hereinafter *"Bowes Dissent "*).

In addressing the first issue, the dissent asserted that "the practical effect of changing a permanency goal from reunification to adoption relieves child services agencies from continuing to provide reunification services to parents." *Bowes Dissent* at 12–13. The dissent rejected the trial court's interpretation of our decisions in *S.E.G.* and *R.J.T.* as providing that concurrent planning could occur even after a goal change from reunification to adoption. *Bowes Dissent* at 14. The dissent contended that a goal change to adoption "extinguished the need for concurrent planning because it is implicit in the goal change that reunification is no longer a viable alternative." *Bowes Dissent* at 15–16. Therefore, the dissent concluded that the trial court erred in providing services in contravention to the Superior Court's prior goal change order.[22]

21. The repeated delays in the courts below are not fully explained and are unacceptable. We direct the Superior Court in future cases to ensure that Fast Track cases do not linger, but instead give such cases "priority in both circulation of and voting on proposed decisions." Superior Court Internal Operating Procedures § 65.42.

22. As in *R.J.T.*, the question of whether a goal change relieves an agency of the need to provide reunification services is not squarely before this Court. As noted, in *R.J.T.*, we questioned the Superior Court's long-standing caselaw on this issue. 9 A.3d at 1186–87 n. 9. While we do not resolve the issue here, we nonetheless note that the Office of Children and Family in the Courts has observed that a goal change from reunification generally relieves the agency of continuing efforts toward reunification; however, "[i]rrespective of a goal change, the judge or master can order the agency to continue to offer services

Turning to the second issue, the dissent opined that the trial court abused its discretion in denying the termination petitions due to the existence of a bond between Mother and the children. After reviewing many of the disturbing details of this case recounted above, the dissent concluded that the record did not support "the existence of a beneficial bond," especially where the children suffer from PTSD and other mental impairments, including highly sexualized behavior, caused by Mother's abuse and neglect. *Bowes Dissent* at 19. The dissent concluded that preserving Mother's parental rights would negatively affect the children and that "the orphan's court effectively condemned the Children to the juvenile system until they reach the age of majority." *Bowes Dissent* at 25.

Judge Bowes highlighted portions of Dr. Pepe's testimony regarding each child and generally discussing pathological bonds that form when a traumatized child "normalizes" the abusive and dysfunctional relationship with a dangerous parent because he or she has nowhere else to turn. *Bowes Dissent* at 25 (citing Notes of Testimony ("N.T."), 4/27/11, at 235–237; N.T., 6/22/11, at 46). The dissent recognized that the trial court was not bound to accept Dr. Pepe's testimony, but nonetheless emphasized that the court had to base its contrary conclusion on evidence in the certified record. The dissent rejected the trial court's conclusion that Dr. Pepe testified that the pathological bonds could be treated with family therapy and parental rehabilitation. Instead, the dissent highlighted that Dr. Pepe opined that such therapy was only possible if the children had a basis to trust and assurances of their safety, which did not exist with Mother. *Bowes Dissent* at 28 (citing N.T., 6/22/11, at 132). The dissent concluded, "I do not believe that a potential, but unlikely, remedy is an adequate ground to disregard Dr. Pepe's findings that Mother's bonds with Children exhibit characteristics of pathology." *Bowes Dissent* at 29. Given the evidence of pathological bonds, the dissent concluded "that CYF demon-

and make reasonable efforts when it is in the best interest of the child." *Pennsylvania Dependency Benchbook* § 11.5 at 122.

strated by clear and convincing evidence that terminating Mother's parental rights would not destroy any existing, necessary, and beneficial parent-child relationships." *Bowes Dissent* at 30.

The dissent next rejected the trial court's reliance on the lack of adoptive resources as a reason for denying termination. The dissent emphasized that under both statutory and case law, where an agency is petitioning for termination of parental rights, it is not necessary for the agency to demonstrate a pending adoption because one of the purposes of the Adoption Act of 1970 was to permit an agency to seek termination separate from adoption. *Bowes Dissent* at 30 (quoting; 23 Pa.C.S. § 2512(b) ("If a petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.")). The dissent further cited cases observing that perpetuating the birth parents' involvement despite their inability to care for a child could in fact "foreclose any hope for adoption." *Bowes Dissent* at 31 (quoting *In the Matter of T.D.*, 949 A.2d 910, 923 (Pa.Super.2008)). Moreover, the dissent maintained that the record also did not support the trial court's conclusion that adoptive resources did not exist. Instead, she found that the record indicated that CYF considered all the children's homes to be pre-adoptive. Bowes Dissent at 31 (citing N.T., 6/22/11, at 174). Judge Bowes further emphasized the testimony of Dr. Pepe in favor of giving the children the permanency of adoption rather than subsidized permanent legal custody.[23] *Bowes Dissent* at 32–33 (citing N.T., 8/31/11, at 95–96). Accordingly, the dissent would have reversed the trial court's denial of the petitions for termination of parental rights as to all the children.

In April 2013, we granted the GAL's petition for review to consider whether "a pathological bond is a bond that is necessary and beneficial" to a child for purposes of termination of parental rights under 23 Pa.C.S. § 2511(b). *In re*

---

23. The dissent, however, did not cite additional testimony of Dr. Pepe indicating that she would not be in favor of adoption if it resulted in the children being legal orphans. N.T., 8/31/11 at 109.

*T.S.M.*, 65 A.3d 293 (Pa.2013). In presenting its primary argument that termination serves the children's needs and welfare given their history of abuse and neglect over the past decade, the GAL summarizes various sociological research and literature indicating that abused and neglected children, like victims of domestic abuse, often develop strong bonds toward their abuser. Despite the abuse, the GAL contends that the victims turn to the abuser for comfort, as the abuser is the one providing for the victim. According to the GAL, the bonds, while strong, may be traumatic, pathological, and unhealthy. Rather than being necessary and beneficial to the children, the GAL argues that these bonds cause confusion and various psychological issues for the victim. Moreover, the GAL contends that the behaviors children develop to cope with severe or long term abuse sometimes make them less able to adapt to the healthy family and social interactions in foster homes. Accordingly, the GAL argues that pathological bonds, even if strong, should not serve as bases to deny termination under Section 2511(b).[24]

The GAL observes that while Section 2511(b) requires courts to "give primary consideration to the developmental, physical and emotional needs and welfare of the child" in considering a termination petition, the statute does not provide guidance as to how courts should evaluate those considerations, nor does it mention the term "bond." This Court, the GAL reports, has directed courts to consider a child's bond with a parent in regard to Section 2511(b). In *In re E.M.*, we stated that the existence of a bond "would not *per se* block a termination of rights" but was nonetheless a factor that must be explored. *In re E.M.*, 533 Pa. 115, 620 A.2d 481, 485 (1993).

The GAL asserts that the Superior Court has further developed this area of the law. The GAL addresses cases where the Superior Court has approved of the termination of parental rights where a bond existed, but where severing the

24. The GAL notes that not all abusive relationships involve pathological bonds but instead asserts that each child's bonding must be considered on an individual basis.

bond would be beneficial to the child. GAL Brief at 19 (citing *In the Matter of T.D*, 949 A.2d at 921–22; *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super.2003), *In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522, 525 (1990)). The Superior Court, the GAL emphasizes, has also indicated that trial courts should consider the children's bonds to foster parents. GAL Brief at 19–20 (citing *In re K.M.*, 53 A.3d 781 (Pa.Super.2012)).

Applying the research and caselaw to the children at bar, the GAL recounts that Dr. Pepe, at the first termination hearing, stated that most of the children's bonds with Mother exhibit characteristics of pathology. GAL Brief at 26 (citing N.T. 4/27/11 at 235–37). It notes that Dr. Pepe concluded that Ti. M. had a pathological bond with Mother, citing N.T., 4/27/11, at 235, and N.T., 6/22/11, at 64. She noted that Ti. M. had Post–Traumatic Stress Disorder ("PTSD"), expressed fear of Mother, and engaged in sexual behaviors, which increased when he thought he would be reunited with Mother. GAL Brief at 27 (citing Report of Dr. Pepe, 12/10–2/11, at 13–15). *Id.* It notes that Dr. Pepe recommended that he remain in his foster parent's home and that his visits with Mother be reduced.

For the other twin, the GAL explains that Tai. M. suffers neurological damage due to abuse in his Mother's care, engages in sexualized behavior (including threatening a girl with rape when he was less than ten years old), has anger management problems, and engages in self-injury. GAL Brief at 28–29 (citing Report of Dr. Pepe, 12/10–2/11, at 19–21). The GAL asserts that Dr. Pepe recommended that he remain with his therapeutic foster home, to be reassessed in six months.

The GAL details that Ty. M. was also diagnosed with PTSD, had a history of explosive disorder involving extreme outbursts including flipping tables over that required admissions to psychiatric hospitals, and engaged in sexualized behaviors. While Ty. M. expressed a desire to return to Mother, the GAL cited testimony that the desire was pathogenic. GAL Brief at 30 (citing N.T., 6/22/11, at 64–65). At one evaluation, Ty. M. conveyed a strong desire to be both adopted and not to be

adopted. Additionally, in the testimony cited by the GAL, Dr. Pepe stated that Mother became upset when Ty. M. referred to his foster brothers as "brothers." GAL Brief at 30 (N.T., 8/31/11, at 74–75). The GAL notes that Dr. Pepe recommended adoption for Ty. M. due to his need for permanence and stability. GAL Brief at 30 (citing N.T., 8/31/11, at 74–76, 93–94).

Regarding N. M., who nearly drowned as an infant and had not been reunited with Mother since, the GAL notes that Dr. Pepe diagnosed him with attention deficit, intermittent explosive, and reactive attachment disorder, the last of which involves his willingness to attach indiscriminately to anyone which was likely a result of pathogenic care. GAL Brief at 30–31 (citing N.T., 4/27/11, at 101–02; N.T., 6/22/11, at 85–86). The GAL emphasized that Dr. Pepe recommended adoption for N.M. because he was doing well in the foster home and that it was imperative for him to have stability and permanency. GAL Brief at 31 (citing N.T., 4/27/11, at 132).

Finally, GAL observed that Tae. M., the youngest of Mother's children before the Court, had the least evidence of pathological bonding or psychological problems, potentially as a result of less exposure to Mother. He nonetheless had some sexualized behaviors (at age six), and alleged that the twins had hurt his private area. The GAL emphasizes that the psychologist concluded that his primary attachment was to his former foster mother; however, that foster mother passed away due to an illness, apparently while the termination petitions were pending. Accordingly, Dr. Pepe did not make a recommendation for permanent placement. GAL Brief at 31–32 (citing Report of Dr. Pepe, 12/10–2/11, at 23–24, 31).

Summarizing, the GAL contends that the three older children had pathological bonds with Mother while the two younger children had no significant bonds with Mother, and that each of the children suffered disorders caused by Mother's abuse and neglect. Accordingly, the GAL argues that the trial court should have concluded that these bonds are not "necessary and beneficial" to the children. GAL Brief at 32.

The GAL disputes the trial court's emphasis on the fact that Dr. Pepe did not mention the pathological nature of the bonds in her reports but only discussed it in her testimony. Instead, the GAL contends that the pathological nature of the bonds was apparent in Dr. Pepe's evaluations, even if the terminology was not used in the reports. As set forth in the dissent below, the GAL further contends that the record did not support the trial court's conclusion that the pathological bonds could be treated with family therapy, given that Dr. Pepe explained that such therapy would only work if the children had absolute assurance of safety and trust. The GAL also asserts that there is no competent evidence supporting the trial court's conclusion that severing the children's bonds to Mother would cause them psychological harm. Instead, the GAL points to testimony by Dr. Pepe that the children would be "upset" or "experience difficulty." GAL Brief at 35–36 (citing N.T., 4/27/11, at 204–05, N.T., 8/31/11, at 85).

The GAL also rejects the trial court's conclusion that it did not serve the children's needs and welfare to terminate parental rights without adoptive placements. First, the GAL contends that the record does not support the trial court's assumption given that all the children were in pre-adoptive placements and that all the foster parents expressed a willingness to consider adoption. GAL Brief at 37 (citing N.T., 6/22/11, at 174). Second, the GAL emphasizes that the relevant statute specifically provides that "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b). Moreover, the GAL cites to testimony by Dr. Pepe expressing a preference for the permanency of adoption for these children over less permanent subsidized permanent legal custody, and opining that without permanency, the children's psychological symptoms could become worse. GAL Brief at 38 (citing N.T., 8/31/11, at 95–108). Accordingly, the GAL argues that "keeping children unavailable for adoption on account of their unhealthy, pathological relationship with their abusive and/or neglectful birth parent most certainly does not serve the needs

and welfare of the Commonwealth's children or the [c]hildren in this case." GAL Brief at 38.

The GAL next argues that our sister courts have found that termination of parental rights is appropriate in cases where pathological or unhealthy bonds exist between a parent and child. GAL Brief at 38–39 n. 31 (collecting cases). The GAL focused upon the Vermont's Supreme Court's decision in *In re J.F.*, 180 Vt. 583, 904 A.2d 1209 (2006). As in this case, the GAL highlights that the trial court in the Vermont case denied termination due to a strong bond between the children and their parents in favor of long-term foster care. The Vermont Supreme Court reversed the denial of termination of parental rights, holding:

> To be sure, in some cases a loving parental bond will override other factors in determining whether termination of parental rights is the appropriate remedy, but in a case such as this, where the evidence and findings plainly demonstrate that the bond is destructive in nature and has greatly harmed the children, it was error for the court to rely on that bond to reject termination of parental rights as an option.

*Id.* at 1213. The GAL argues that this case similarly involves long-term involvement with the state agency, multiple failed reunification attempts, difficulty in foster placement due to the birth parent's attempts to undermine the placements, and the children's desire to be with the parent despite also fearing the parent. In these cases, the GAL argues that the bond between the parent and the child is unhealthy, even if it is strong.

Finally, the GAL contends that the denial of termination in this case violates the public policy behind the changes to the child welfare system following the enactment of ASFA. The GAL maintains that the statutory changes contemplated resolution of cases within eighteen months of children's removal from their parent's care, either by reuniting the children with parents or by providing them permanent adoptive homes. In contrast, the GAL observes that, as of the denial of the termination petitions, Ty. M. and N.M. had been out of

Mother's care for five and a half years and Ti. M., Tai. M., and Tae. M. had been out of Mother's care for three years in addition to time spent out of her care during an earlier removal. The GAL argues, "Refusing to terminate rights in cases where the child is only tied to a parent by a harmful and pathological bond and where reunification is not a viable option in the foreseeable future effectively condemns the child to the juvenile system until he or she reaches the age of majority." GAL Brief at 43. The GAL therefore urges the Court to reverse the decision below and order termination of Mother's parental rights to the five children before this Court in order to provide them with necessary security and permanence.[25]

In response, Mother contends that the GAL is seeking an advisory opinion from this Court regarding pathological bonds because the trial court did not make a specific finding on whether pathological bonds existed in the case. Mother also argues that the GAL waived this issue by not raising it specifically in its Pa.R.A.P. 1925(b) statement of matters complained of on appeal. We reject Mother's preliminary arguments and instead find the GAL's issue encompassed by the question raised in the Pa.R.A.P. 1925(b) statement: "The Trial Court abused its discretion and/or erred as a matter of law when it found that CYF did not present clear and convincing evidence supporting the termination of parental rights of Mother pursuant to 23 Pa.C.S. § 2511(b)." Given that the trial court's denial of the termination petitions was based primarily upon the existence of a bond between the children and Mother and the concern that severing that bond would cause "irreparable harm," Tr. Ct. Op. at 29, the GAL has always argued that the existence of a bond should not prevent the conclusion that termination of parental rights serves the needs and welfare of the children. The inclusion of the term "pathological" in the question presented does not change the underlying challenge.

25. The Penn State University Dickinson School of Law Children's Advocacy Clinic *et al.* file an Amici Brief in support of the GAL.

Turning to merits of the case, Mother contends that the GAL is seeking to have this Court substitute the GAL's fact-finding for that of the trial court. Mother implicitly acknowledges that CYS demonstrated the elements of Section 2511(a)(2): "testimony presented at trial essentially established that Mother's incapacities have left the children without parental care and control and that those incapacities cannot be remedied." Mother's Brief at 3. She contends, however, that the trial court correctly found that it would not serve the children's needs and welfare to terminate her parental rights under Section 2511(b).

Mother emphasizes that the children have repeatedly moved between foster homes and that, at the time of the termination hearings, only N.M. had a committed pre-adoptive placement, while the other foster parents were only willing to consider adoption. Mother highlights that Dr. Pepe testified that it would not be in the best interest of the children to have Mother's parental rights terminated if the result would be that the children would be orphaned without committed pre-adoptive placements. Mother's Brief at 4 (citing N.T., 4/27/11, at 134). While Mother recognizes that an adoptive home is specifically not required under 23 Pa.C.S. § 2512(b), she emphasizes that courts may consider the existence of a pre-adoptive home in determining whether termination serves the needs and welfare of the children. She contends that the court below properly considered the absence of permanent adoptive homes in this case.

Mother observes that this Court has stated that the breaking of a child's bond to a parent can result in the child suffering "extreme emotional consequences." Mother's Brief at 12 (quoting *In re E.M.*, 620 A.2d at 485).[26] Mother asserts

26. As previously noted, Mother is in essence asking this Court to perpetuate a Catch–22, where her abusive parenting has created pathological bonds in the children that cannot be severed without causing further harm to the child. The result, however, is that the children strengthen their unhealthy bonds with Mother, who is unlikely to be able to parent them, and yet are stymied from forming healthy bonds with their foster families who could provide them permanency and, with it, well-being.

that the trial court's finding that these children would suffer irreparable harm from termination of her parental rights is supported by Dr. Pepe's opinion that the children should have continued relationships with Mother through open adoptions. Mother maintains that the trial court's factual findings are supported by the record and that the GAL is attempting to have this Court substitute its own judgment for that of the trial court. Accordingly, Mother argues that this Court should affirm the denial of termination of Mother's parental rights.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa.2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d at 1190.

CYF must prove the grounds for termination of parental rights under 23 Pa.C.S. § 2511 by clear and convincing evidence. *See In re Adoption of S.P.*, 47 A.3d at 821–22. As noted above, Mother does not contest that CYS demonstrated grounds for termination under subsection (a). As relevant to this case, if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super.2012). In

*In re E.M.*, 620 A.2d at 485, this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

The Superior Court has emphasized that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition. Instead, as Judge Tamilia eloquently observed while speaking for the court, it is "an immutable psychological truth" that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super.2008). Thus, Judge Tamilia cautioned against denying termination of parental rights based solely on the fact that a child has an attachment to the parent: "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.* at 535 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa.Super.2003)) (Tamilia, J., dissenting).[27]

■ Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *See In re K.M.*, 53 A.3d at 791. Indeed in cases where the petitioner is a party standing *in loco parentis,* the statute requires the party to file a report of intention to adopt. 23 Pa.C.S. § 2512(a)(3). Likewise, this Court has noted that a petition to terminate parental rights filed by a biological parent "is only cognizable when it is accompanied by a prospective stepparent's intention to adopt the child," noting that

27. We recognize, however, that the Superior Court in *K.K.R.-S.* addressed a situation where no clear bond between the mother and child was apparent, and thus rejected the mother's attempt to require CYS to prove the absence of a positive bond.

the public policy behind this provision is to prevent "state-created orphans." *In re Adoption of L.J.B.*, 610 Pa. 213, 18 A.3d 1098, 1107–08 n. 11 (2011) (plurality). Notably, however, the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies such as CYF: "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b).

The Superior Court has rejected the suggestion that termination of parental rights is inappropriate when adoption is not imminent and has allowed termination even if it results in the child temporarily being without one or both parents. *See In re C.W.U., Jr.*, 33 A.3d 1, 9 (Pa.Super.2011). Additionally, the Superior Court has observed that termination may improve the likelihood of finding an adoptive home. *See In the Matter of T.D.*, 949 A.2d at 922–23. Indeed, in some cases, a child's bond with a parent, who has proven incapable of caring for the child, may impede the child's ability to attach to a pre-adoptive family who can provide the needed care and stability. *See Id.* at 921; *In re J.F.*, 904 A.2d at 1216. Nonetheless, the Superior Court has expressed concern for terminating parental rights absent a pre-adoptive home especially in the case of an older child, whose consent is needed for adoption, lest the child age out of foster care without any permanent family. *See In the Matter of T.D.*, 949 A.2d at 922.

Moreover, members of this Court have opined that the existence of a pre-adoptive home is "an important factor" in termination cases. *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 575 (2011) (Saylor, J., concurring). We have questioned whether a grant of termination would require that an "agency must intend subsequent to termination to seek out an adoptive parent." *In re Adoption of L.J.B.*, 18 A.3d at 1107 n. 8. Indeed, decades ago, we opined in *obiter dictum* that an agency may not terminate parental rights absent a contemplated adoption. *In re B.E.*, 474 Pa. 139, 377 A.2d 153, 155 n. 5 (1977). The Office of Children and Family in the Courts, however, recently provided direction in the Dependency

Benchbook, "While having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of an eventual adoption." Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* § 12.1 at 126 (2010).

As the prior paragraphs reveal, contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.,* 9 A.3d at 1190 (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children,

requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.*, 9 A.3d at 1186; *In re Adoption of S.E.G.*, 901 A.2d at 1019. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See,* 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

Considering these statutory purposes, we reject the trial court's suggestion that "the ultimate exception to ASFA time frames should be until a child finds meaningful, loving relationships with a family and committed homes are established." Tr. Ct. Op. at 19. The trial court's suggested exception could swallow the rule, and permanency could be obstructed in cases where children have been unable to form healthy bonds with foster families, potentially as a result of their unhealthy bonds with biological parents who may be undermining their relationship with their foster family. *See, e.g. In the Matter of T.D.*, 949 A.2d at 921; *In re J.F.*, 904 A.2d at 1215–16 (terminating parental rights where biological parents could not parent child and instead hampered child's ability to bond with foster family and attain stability).

■■■ Similarly, we question the trial court's use of concurrent planning in this case. We commend the trial court for recognizing that concurrent planning is a best practice, as it allows agencies to provide families with services in hopes of reunification while also preparing for the child's potential adoption. Concurrent planning is especially useful early in

the proceedings when it is unclear whether the parents will be able to learn to parent their children. Conversely, we caution that concurrent planning should not be used to prolong instability for children when it becomes clear that parents will be unable to provide their children's basic needs in the near future. Trial courts' use of concurrent planning beyond its useful life can create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents, thus perpetuating the problem of foster care drift. As Dr. Pepe observed in her testimony, the child is conflicted "between loyalty to a biological parent and loyalty to a foster parent, pre-adoptive parent, adoptive parent. When it is clear to the child that they are in their permanent home, then the conflict can diminish, which can result in less disruptive behaviors and a greater sense of security." N.T., 8/31/11, at 107.

While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children. The trial court made valiant efforts to utilize concurrent planning and family group decision making; however, these efforts were inappropriate in a case such as this, where, at the time of the termination hearing, Mother had the benefit of services for over five years without showing the potential of being able to parent the children in any reasonable period of time.

In this case, the children have unhealthy bonds to Mother, who is seemingly the root of their manifold psychological and behavioral conditions. Moreover, Mother appears to be interfering with the children's bonding to their foster families, resulting in confusion for the children and further delay in permanency for the children. For example, Ty. M. reported that Mother told him that he would not be adopted and that his foster brothers "were not his brothers." *See* Report of Dr. Pepe, 6/23–30/11, at 5. Dr. Pepe opined that Ty. M. "would naturally have ambivalence regarding adoption given his age [eight] and level of attachment to his biological

mother but that her comments could serve to cause increased confusion with the child." *Id.*

Whether or not the children have current bonds to their foster families, there appears to be a "strong likelihood of an eventual adoption." *Pennsylvania Dependency Benchbook* § 12.1 at 126. Indeed, Dr. Pepe specifically recommended adoption for Ty. M., Tai. M., and N. M., N.T., 8/31/11, at 102; Report of Dr. Pepe, 6/23–30/11, at 5; Report of Dr. Pepe, 12/10–2/11, at 31. In regard to Ti. M., Dr. Pepe did not recommend adoption at the time of the evaluation, but nonetheless did not recommend reunification and suggested reduced visitation with Mother. Report of Dr. Pepe, 12/10–2/11, at 28. The youngest child, Tae. M., previously had a very strong and positive bond with his pre-adoptive foster mother who, unfortunately, became ill and unable to care for Tae. M. Report of Dr. Pepe, 12/10–2/11, at 23. While no adoptive home was present at the time of the hearings, one can presume that a permanent home will be found for Tae. M, when he is freed for adoption.

Although we defer to a trial court's determination regarding termination when it is supported by the record, we must reverse the trial court's determination in this case because we find the court's conclusion to be manifestly unreasonable, and thus an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826. In relying upon the mere existence of the bond between Mother and the children, the trial court failed to recognize the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond with Mother, especially as it affected the children's ability to form attachments to foster families who could have provided the necessary love, care and stability that these children have so needed for the past decade. We conclude without hesitation that it best serves their needs and welfare to sever their bond with Mother permanently, in order to permit them to be placed forthwith into healthy, permanent homes. Accordingly, we reverse the Superior Court decision affirming the trial court's denial of termination of parental rights and order the trial court to enter orders terminating Mother's parental

rights as to the five children before this Court. We expect this to be done promptly, and we further expect the child welfare agency and court to give this case their utmost attention so that these children have a chance for normal lives. Jurisdiction relinquished.

Chief Justice CASTILLE, and Justices SAYLOR, EAKIN, TODD and McCAFFERY join this opinion.