J. S10044/20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: N.R., A MINOR :    IN THE SUPERIOR COURT OF
                                            :           PENNSYLVANIA
                                            :
APPEAL OF: J.S., NATURAL FATHER    :        No. 1829 MDA 2019

Appeal from the Decree Entered October 22, 2019,
in the Court of Common Pleas of Franklin County
Orphans' Court Division at No. 61 ADOPT 2019

BEFORE: PANELLA, P.J., KUNSELMAN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED APRIL 01, 2020**

J.S. ("Father") appeals from the October 22, 2019 decree entered in the

Court of Common Pleas of Franklin County, Orphans' Court Division,

involuntarily terminating his parental rights to his dependent male child, born

in June 2018 (the "Child"), pursuant to the Adoption Act, 23 Pa.C.S.A.

§§ 2511(a)(1), (2), and (b).[1]  We affirm.

The orphans' court set forth the following factual findings:

> [In June] 2018, [Franklin County Children & Youth
> Service (the "Agency")] received a referral concerning
> [the Child,] a newborn[,] who was in the Newborn
> Intensive Care Unit (NICU) at the Chambersburg
> Hospital; the referral relayed concerns regarding
> [M]other's ability to provide the [C]hild with basic
> care.  The following day, the Agency conducted a
> hospital visit to determine whether Mother would be
> able to care for [the Child] upon discharge.  Mother
> related Father was incarcerated at the Franklin County

---

[1] We note that on the same date, the orphans' court entered a decree that
terminated the parental rights of the Child's natural mother, I.R. ("Mother").
Mother is not a party to this appeal.

Jail[Footnote 2] and was facing deportation, leaving her without sufficient family supports.

> [Footnote 2] The record reveals the following concerning Father's incarceration[:] On February 6, 2018, Father was charged by the Chambersburg Police Department with two third degree felonies—Dissemination of Sexually Explicit Materials to a Minor and Unlawful Contact with a Minor—as well as felony counts of Identify Theft and Theft by Unlawful Taking—Movable Property. As a result, Father was incarcerated at the Franklin County Jail on February 6. He subsequently pled guilty to the Dissemination charge and entered a plea of nolo contendere on the Identity Theft charge.
>
> The February 2018[] charges were not Father's first run-in with the law. In July 2014, he was charged with Simple Assault and was placed on Accelerated Rehabilitative Disposition (ARD). However, Father later violated the conditions of ARD, and his participation in ARD was revoked as a result. In April 2015, Father was charged with Theft by Deception—False Impression, to which he later pled guilty.

[When the Child] was discharged from Chambersburg Hospital [eight days after his birth,] the [orphans' c]ourt immediately entered an Order for Emergency Protective Custody; [the Child] was placed in the temporary physical and legal custody of the Agency, as [the orphans' court] determined that allowing [the Child] to remain in the home would be contrary to his welfare, given Mother's issues with mental health and substance abuse, as well as her overall parenting ability.

That same day, a caseworker for the Agency visited Father at the Franklin County Jail and advised him of [the Child's] placement with the Agency. Until that meeting, Father was unaware [the Child] had been born. On June 19, 2018, the Agency attempted to contact Father again, but was advised Father had been transferred out of the Franklin County Jail the previous day. At the time of the Adjudication and Disposition Hearing, which occurred on June 28, 2018, the Agency was without knowledge of Father's location.

In July 2018, the Agency became aware Father had been transferred to York County prison where he was in Immigration and Customs Enforcement (ICE) custody awaiting deportation. Because [the Child] was declared dependent, Father was ordered to establish and maintain consistent contact with [the Child] and the Agency if Father wished to be considered a resource for [the Child].[Footnote 3]

> [Footnote 3] Had Father been released from custody at any point during this process, the Agency indicated further evaluation would be necessary to determine whether any additional parenting service was needed.

Hannah Crean, a caseworker with the Agency who was assigned to [the Child's] case, testified at the hearing to Father's contacts with the Agency. She stated Father sent many letters to the Agency, but had never sent any letters or other correspondence directed to [the Child].[Footnote 4] In his letters to the Agency, Father focused primarily on his request that his mother, Ms. [S.], be considered a resource for [the Child]. The letters generally did not inquire into [the Child's] well-being, though he did express a desire to be there for [the Child] and make sure [the Child] was being cared for.

> [Footnote 4] Ms. Crean testified that Father has in fact been provided with the

foster agency's information, including its mailing address.

With respect to Father's request that his mother[, Ms. S.,] be awarded custody of [the Child], Ms. Crean testified that the Agency made efforts to determine whether the request was tenable. Specifically, the Agency conducted an Interstate Compact on the Placement of Children (ICPC) study on Ms. [S.][Footnote 5]

> [Footnote 5] This is legally required before approving placement outside of Pennsylvania, and Ms. [S.] lives in North Carolina.

The study was denied, however, as Ms. [S.] failed to provide the necessary information requested of her. In particular, Ms. [S.] was residing with another individual who the Agency attempted to collect information on for the purpose of completing background checks; information on this individual was not provided.[Footnote 6] Further, Ms. [S.] has never met [the Child].

> [Footnote 6] The Agency communicated with Ms. [S.] through written correspondence. While Ms. Crean conceded the correspondence was in English although Ms. [S.] only speaks Haitian Creole, Ms. [S.] was able to respond to the letter indicating she was willing to be a resource for [the Child].

While Father was at the York County prison, the Agency made several attempts to contact him and set up phone conferences both for court purposes and to update him on [the Child's] status. Those attempts were all unsuccessful, though there is no allegation this was due to Father's refusal to cooperate.

In May 2019, Father was relocated to the Clinton County correctional facility where he remains to this day. While he finished serving his criminal

> incarceration, he continues to be held in ICE custody awaiting deportation, and, according to representations by authorities at Clinton Correctional, will not be released from prison. Because Father has been incarcerated since [the Child's] birth, Father has never met [the Child]; as such, Ms. Crean testified she has "no reason to believe there is a bond or attachment" between the two.
>
> On the other hand, Ms. Crean stated [the Child] has been with his foster parents for fifteen months, and they are willing to be a permanent resource for him; in her opinion, [the Child's] foster parents are meeting "all of his needs, welfare, and emotional needs."

Orphans' court opinion, 11/25/19 at 2-6 (record citations omitted).

At the conclusion of the hearing, the orphans' court entered the order involuntarily terminating Father's parental rights to the Child. Father filed a timely notice of appeal, together with a concise statement of errors complained of on appeal in compliance with Pa.R.A.P. 1925(a)(2)(i). Thereafter, the orphans' court filed its Rule 1925(a)(2)(ii) opinion.

Father raises the following issue for our review:

> Did the [orphans' c]ourt err in summarily [t]erminating [Father's] parental rights when limited effort was engaged in by the Agency possessing [the Child], to unite the [C]hild with [Father's m]other so to keep the familial bond in place, pending [Father's] availability and where [Father] was not offered counsel until after a filing to terminate his rights occurred?

Father's brief at 6.

At the outset, we note that Father raised the following "reason for his appeal" in his Rule 1925(a)(2)(i) statement:

> Failure of preventative agencies to meet burdens of 25 Pa.C.S.[A. §] 2511(a)(2), (a)(5), (a)(8), by [the] fact that an agency did not exercise diligent efforts to facilitate [Father's] requests to maintain his parental relationship via placement of the [C]hild with his mother.

Father's Rule 1925(a)(2)(i) concise statement, 11/6/19.

In his appellate brief, Father contends that he "was not appointed an attorney at the time of the [A]gency's intervention in the case, but only after [the Agency] filed a petition to terminate his rights." (Father's brief at 9.) Even if Father preserved this claim with the orphans' court by including it in his concise statement as required by Pa.R.A.P. 1925(b)(4)(vii), the issue would not properly be before us. Father appeals the termination order on the adoption docket. Father did not take an appeal from a final order on the dependency docket. Consequently, claims of error arising from the dependency proceeding are not properly before us.

We further note that the issue raised in Father's concise statement is not entirely consistent with the issue raised in his brief. Nevertheless, we conclude that the issue Father raises for our review is fairly suggested in his concise statement; specifically, that the orphans' court erred in terminating his parental rights because the Agency only made a limited effort to place the Child with Father's mother, Ms. S.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing

> evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*), quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998).

Here, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b). Father, however, advances no claim that the orphans' court erred or abused its discretion in terminating his parental rights under any of those sections. Rather, Father contends that the orphans' court erred in terminating his parental rights because the Agency engaged in limited efforts to unite the Child with Father's mother, Ms. S. It is well settled that neither Section 2511(a)(2) nor (b) requires an orphans' court to consider the reasonable efforts provided to a parent prior to terminating parental rights. *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014); *see also In re C.K.*,

165 A.3d 935, 944 (Pa.Super. 2017) ("parental rights may be terminated even if the agency fails to make reasonable efforts to reunify the family"); *In re B.L.W.*, 843 A.2d 380, 384 n.1 (Pa.Super. 2004) (*en banc)* ("the adequacy of [the agency's] efforts towards reunification is not a valid consideration at the termination of parental rights stage, as the law allows [the agency] to 'give up on the parent'" (citation and internal brackets omitted).) Clearly, then, neither Section 2511(a)(2) nor (b) requires the orphans' court to consider the reasonable efforts to unite the Child with Father's mother prior to terminating Father's parental rights.[2] Nevertheless, we will proceed to review the orphan court's termination order.

We have long held that, in order to affirm a termination of parental rights, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d at 384. We will, therefore, analyze the orphans' court's termination order pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal

---

[2] We note that the record reflects that the Agency did make efforts to determine whether Ms. S. was a viable resource. The inquiry ended, however, when Ms. S. failed to provide the Agency with information that it requested which was necessary to the determination. (Notes of testimony, 10/22/19 at 11.)

> of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> To terminate parental rights under section 2511(a)(2), the moving party must produce clear and convincing evidence of the following elements: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa.Super. 2003).

. . . .

The Pennsylvania Supreme Court has instructed that incarceration,

> while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 [Pa.C.S.] § 2511(a)(2). *See* [*In re: E.A.P.*, 944 A.2d 79, 85 (Pa. Super. 2008)] (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

Accordingly, courts properly consider the incapacitating effect of a parent's incarceration and whether the duration of that incarceration would prevent a parent from remedying the incapacity. *See id.*; *see also In re D.C.D.*, 629 Pa. 325, 105 A.3d 662, 677 (2014) (holding that trial court properly concluded that father's incarceration rendered him "incapable of providing care for his child and that [his] incapacity will exist at least until [f]ather's minimum release date [four years later], when [c]hild will be seven").

*In re Adoption of:  A.C.*, 162 A.3d 1123, 1131-1132 (Pa.Super. 2017)

(brackets in original).

Here, the record reflects that at the time of the Child's birth, Father was incarcerated and was not aware that the Child had been born. When the Agency filed the termination petition, Father remained incarcerated. Moreover, at the time of the termination hearing, which was 15 months after the Child's birth, Father was still incarcerated and was awaiting deportation. Indeed, Father testified that he did not know when he would be an available resource for the Child. (Notes of testimony, 10/22/19 at 50-51.) The record further reflects that Father was required to establish consistent contact with the Child, which he failed to do. Therefore, we conclude that the record supports the orphans' court's factual findings and that the orphans' court did not abuse its discretion in terminating Father's parental rights under Section 2511(a)(2). The record demonstrates that the conditions that existed upon removal establish repeated and continued incapacity, abuse, neglect, or refusal of Father that caused the Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being. The record also supports the orphans' court's conclusion that Father continued to lack capacity to parent the Child.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as

> love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> [w]hile a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love,

> comfort, security, and stability the child
> might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015), quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and

citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that

courts considering termination must also consider whether the children are in

a pre-adoptive home and whether they have a bond with their foster parents."

*T.S.M.*, 71 A.3d at 268. The court directed that, in weighing the bond

considerations pursuant to Section 2511(b), "courts must keep the ticking

clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed,

"[c]hildren are young for a scant number of years, and we have an obligation

to see to their healthy development quickly. When courts fail . . . the result,

all too often, is catastrophically maladjusted children." *Id.*

Here, in terminating Father's parental rights under Section 2511(b), the

orphans' court found that:

> [Father] has never met [the Child]. While he may
> have love and concern for the [C]hild, [the orphans'
> court] cannot find that a parent/child bond exists.
> [Father] has never provided for the [C]hild's physical,
> emotional, [and] moral well[-]being or welfare, and is
> in no position to do so in the foreseeable future.
>
> On the other hand, the [C]hild is in a foster family
> where his needs are met. The foster family has
> offered themselves as a permanency resource. It is
> in the [C]hild's best interest to move the [C]hild
> forward toward permanency.

J. S10044/20

Decree, 10/22/19 at 4.

Our review of the record supports this determination, and the orphans' court did not abuse its discretion in terminating Father's parental rights to the Child.

Accordingly, we find no abuse of discretion and conclude that the orphans' court appropriately terminated Father's parental rights to the Child under Sections 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/01/2020

- 15 -