J-S08020-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B.C., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.C., SR. | : | No. 1333 MDA 2021 |

Appeal from the Decree Entered September 17, 2021
In the Court of Common Pleas of York County Orphans' Court at No(s):
2021-0110a

BEFORE:  BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY NICHOLS, J.:          **FILED: MAY 25, 2022**

K.C., Sr. (Father), appeals from the decree involuntarily terminating his parental rights to his son, K.B.C., Jr. (Child), born in March of 2021.[1]  Father argues that the trial court erred in denying his motion to stay the proceedings pending the outcome of his appeal from the goal change order.  He also challenges the sufficiency of the evidence supporting involuntary termination of his parental rights under 23 Pa.C.S. § 2511(a)(2).  Following our review, we reverse.

We briefly summarize the underlying facts and procedural history of this matter as follows.  On March 26, 2021, the York County Office of Children, Youth and Families (CYF) filed an application for emergency protective

---

[1] The trial court's decree also terminated the parental rights of J.F. (Mother). Mother did not appeal.

custody.[2]  Therein, CYF stated that it had received a general protective services report alleging that Father appeared to have been intoxicated when Mother was admitted to the hospital to give birth.  The report alleged that, after Child's birth, Father "appeared to pass out," at which point Child was returned to the NICU and Father was removed from the premises.  *Id.* at 2.  The report also stated that Father's behavior had been a concern prior to Child's birth, as hospital personnel reported that Father left an alcohol bottle behind at one of Mother's prenatal visits.  *Id.*

On March 26, 2021, the trial court entered an order for emergency protective custody transferring legal and physical custody of Child to CYF and placing Child in foster care.  The court later confirmed this decision in a shelter care order dated April 7, 2021.

CYF filed a dependency petition on April 8, 2021.  Therein, CYF stated that Father had a history of hostility and aggression and that he "had been escorted out of the hospital" following Child's birth because "he was intoxicated and he had fallen asleep."  *Id.* at 3.  That same day, CYF filed a motion for a finding of aggravated circumstances as to Mother, but not Father.

_____

[2] CYF explained that it had a history of involvement with Mother since the time that she was a minor.  Further, CYF averred that it had been involved with Mother's older children since 2013 due to both parenting and domestic violence concerns.  This resulted in the involuntary termination of Mother's parental rights to seven older children in January of 2020.

The trial court adjudicated Child dependent on April 19, 2021. At that time, the court confirmed its transfer of custody to CYF and Child's placement in foster care. The court also established Child's permanent placement goal as adoption with a concurrent goal[3] of return to parent or guardian. The court entered a separate order finding aggravated circumstances as to Mother and directed that no effort be made to reunify Mother with Child.

Under the service plan, Father was required to (1) participate in drug and alcohol, psychological, threat of harm, anger management, and parenting capacity evaluations; (2) participate in a medical evaluation to clear his physical health; and (3) cooperate with CYF services for random drug and alcohol testing, an in-home team, individual drug and alcohol counseling, individual mental health counseling, alcoholics anonymous meetings, parenting classes, and domestic violence treatment.

The trial court held a permanency review hearing on May 11, 2021. CYF presented testimony from Linda Tirado-Lopez, a drug and alcohol monitoring specialist with Families United Network. Ms. Lopez testified that Father had completed his intake for intensive family services. Ms. Lopez stated that she had contacted Father to complete his alcohol testing on six occasions. She

_____

[3] In **T.S.M.**, our Supreme Court confirmed that "concurrent planning is a best practice, as it allows agencies to provide families with services in hopes of reunification while also preparing for the child's potential adoption. Concurrent planning is especially useful early in the proceedings when it is unclear whether the parents will be able to learn to parent their children." **In re T.S.M.**, 71 A.3d 251, 269-70 (Pa. Super. 2013).

indicated that Father tested negative for alcohol three times. She also explained that although she attempted to conduct three additional tests, Father had been unavailable. CYF caseworker Chelsea Rhoads also testified that Father was attending weekly visits with Child and had only missed one scheduled visit. Although Ms. Rhoads expressed concern about Father's parenting abilities, she recommended that Child remain in his current placement and that Father continue to work on his service plan goals.

Following the hearing, the trial court concluded that Father had failed to comply with his permanency plan and made no progress toward alleviating the circumstances necessitating Child's placement. Although only twenty-two days had elapsed since the dependency hearing, the court concluded that "quite frankly, there is virtually zero chance that Father is going to be able to do anything to make this reunification happen." N.T. Goal Change Hr'g, 5/11/21, at 21. Therefore, the court maintained Child's permanent placement goal as adoption, but changed Child's concurrent goal from return to parent or guardian to placement with a subsidized permanent legal custodian (SPLC).

The court's order stated that Father would no longer have visitation with Child, and that CYF was no longer required to provide Father with reunification services, although "a parenting capacity assessment and drug and alcohol evaluation may still remain in place." Permanency Review Order – Amended, 6/10/21, at 4.

Father subsequently appealed the trial court's dependency and goal change orders. On May 28, 2021, while Father's appeal was pending before this Court, CYF filed a petition to terminate Father's parental rights.

The trial court held a termination hearing on September 17, 2021. Father and Mother appeared at the hearing and participated with the assistance of counsel.[4] Prior to the start of the hearing, Father's counsel made an oral motion to stay the termination proceeding pending the outcome of his appeal from the dependency and goal change orders. N.T., 9/17/21, at 5-6. The court denied Father's motion and proceeded with the hearing. *Id.* at 6.

Ultimately, the trial court granted CYF's petition to terminate Father's parental rights. *Id.* at 52; *see also* Order, 9/17/21.

On October 15, 2021, Father timely filed a notice of appeal and a Pa.R.A.P. 1925(b) statement in compliance with Rule 1925(a)(2)(i). The trial court issued a Rule 1925(a) opinion addressing Father's claims.

On appeal, Father raises the following issues for our review:

1. Did the trial court commit an abuse of discretion and error of law in allowing the termination of parental rights hearing to proceed over Father's objection when the adjudication of dependency and change of goal were the subjects of open appeals still pending before [this Court]?

2. Did the trial court commit an abuse of discretion and error of law in granting [CYF's] petition for involuntary termination of

---

[4] Additionally, the trial court appointed legal counsel and a separate guardian *ad litem* to represent Child, both of whom expressed support for termination of Father's parental rights. **See** N.T., 9/17/21, at 51.

parental rights when insufficient evidence was presented to satisfy [CYF's] burden of proof?

Father's Brief at 5.

Initially, we note that after Father filed his appeal in the instant case, a panel of this Court issued a decision in Father's appeal from the dependency and goal change orders. ***See In the Interest of K.C.***, 2021 WL 5409988 (Pa. Super. filed November 19, 2021) (unpublished mem.). In relevant part, the panel concluded that the evidence did not support the trial court's rapid goal change and discontinuation of reunification services. ***Id.*** at *6. In reaching that conclusion, the panel reasoned that Father had received services for only a short time — at most, twenty-two days — and that he had acted affirmatively by submitting to alcohol screens, attending supervised visitation with Child, and completing an intake for intensive family services. ***Id.*** Moreover, the panel found that the trial court had disregarded the Juvenile Act's purpose of promoting family unity. ***Id.*** at *6-7; ***see*** 42 Pa.C.S. § 6301(b)(1) (explaining that the Juvenile Act "shall be interpreted and construed as to," among other things, "preserve the unity of the family whenever possible"). Therefore, the panel affirmed the trial court's dependency finding but reversed the goal change decision. ***Id.***

## Motion to Stay

In his first issue, Father argues that the trial court erred in denying his motion to stay the termination proceeding pending the outcome of his appeal

from the trial court's dependency and goal change orders.[5]  Father's Brief at 11.  Father argues that the trial court's goal change order rendered the outcome of the termination hearing inevitable, as the court's goal change order denied him the reunification services he needed to avoid termination.  *Id.* at 11-16.  Further, he asserts that "[f]or a court to cease reunification services and prevent reunification efforts after just 22 days, and subsequently terminate Father's parental rights due to his alleged inability to achieve reunification is manifestly unreasonable."  *Id.* at 13.

However, Father's argument goes more to the merits of the trial court's decision to terminate his parental rights than it does the decision to grant or deny a stay.  Moreover, Father directs our attention to no legal authority, and we are aware of none, requiring that a trial court stay a termination proceeding if a dependency or goal change appeal is pending.  Indeed, our Supreme Court has stated that a pending appeal should not prevent a dependency matter from moving forward.  *See In re H.S.W.C.-B.*, 836 A.2d 908, 911 (Pa. 2003) (stating that "generally, a stay should not be ordered and

---

[5] In its Rule 1925(a) opinion, the trial court concluded that Father waived this claim.  The court acknowledges that Father made an oral motion to stay the termination proceeding, which the court denied.  However, the court proposes that Father was required to "object to the hearing going forward" to preserve his claim for our review.  Trial Ct. Op., 11/12/21, at 4.  The court is mistaken in its analysis.  Once Father made a motion to stay, and the court denied the motion on the record, Father's request was "raised in the trial court," which is sufficient to avoid waiver.  *See* Pa.R.A.P. 302(a) (providing that claims will be waived on appeal if a party did not raise them before the trial court); *see also*, *e.g.*, Pa.R.E. 103(b) (stating that "[o]nce the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal").

proceedings halted pending the appeal. As the best interest of the children is always paramount, the continued finger of the trial court on the pulse of the case is needed, even while the matter is appealed"); *see also In re R.P.*, 956 A.2d 449, 455 (Pa. Super. 2008) (explaining that "[m]aintaining the status *quo* while awaiting resolution of a parent's appeal could never justify the risk to a child forced to remain in a possibly unsafe or unsatisfactory situation"). Therefore, Father's first claim fails.

## Termination of Parental Rights

Father also challenges the evidence supporting termination under Section 2511(a)(2). By way of background to this claim, we reiterate that CYF filed a petition to involuntarily terminate Father's parental rights on May 28, 2021.[6] At the termination hearing, CYF presented testimony from Gary Calhoun, a drug screener from Families United Network. Mr. Calhoun stated that on April 7, 2021, he received a referral requesting alcohol testing for

---

[6] In the portion of the petition "[s]et[ting] forth the ground(s) for involuntary termination," CYF listed Section 2511(a)(1), but then quoted the language of Section 2511(a)(2). *See* Petition for Involuntary Termination of Parental Rights, 5/28/21, at 4. This demonstrates that the petition's reference to Section 2511(a)(1) was merely a typographical error, and that CYF intended to seek termination pursuant to Section 2511(a)(2) and no other subsection of 2511(a). In its opinion, the trial court concluded that termination was warranted under Section 2511(a)(1), (2), and (5). However, because CYF only sought termination under Section 2511(a)(2), it was improper for the court to terminate Father's parental rights under Sections 2511(a)(1) and (5). *See, e.g., In the Interest of: T.J.J.M.*, 190 A.3d 618, 629 (Pa. Super. 2018) (stating that "[b]ecause [the child welfare agency] did not proceed under Section 2511(a)(5) and (8), we conclude that the trial court erred to the extent it terminated [the f]ather's parental rights pursuant to these subsections").

Father. N.T., 9/17/21, at 8-10. Since then, he stated that Father had tested positive for alcohol four times, tested negative three times, and was unavailable to test thirty-three times. *Id.* at 8, 11. Father also refused to submit to testing six times. *Id.* at 9. Father's most recent positive test occurred on July 16, 2021, and his most recent negative test occurred on May 4, 2021. *Id.* at 10-11. Father's blood alcohol levels during positive tests ranged from 0.16 to 0.35. *Id.* at 11.

CYF also presented testimony from Ms. Rhoads, an agency caseworker. Ms. Rhoads stated that CYF prepared only one family service plan for Father, which was in March of 2021. She stated that CYF had not prepared any updated plans because of the order changing Child's concurrent goal and ending reunification services. *Id.* at 15-16. Regarding the services CYF deployed to assist Father, Ms. Rhoads explained that Father had received an in-home team through Pressley Ridge. *Id.* at 16-17. However, this service ended when the trial court entered the goal change order. *Id.* at 16. Ms. Rhoads further testified that CYF referred Father for a parenting capacity assessment, which "was scheduled for July[,]" but Father failed to appear for his appointment and did not reschedule it. *Id.* Ms. Rhoads added that Father's current home was inappropriate for reunification because Mother also lived there, and the trial court had issued a finding of aggravated circumstances against her. *Id.* at 19. However, Ms. Rhoads acknowledged that she had not been to Father's home, and was not aware if it was otherwise appropriate for Child. *Id.* at 30.

Regarding Father's parenting skills, Ms. Rhoads testified that Father struggled during his visits with knowing when to feed and change Child, how to prepare a bottle and provide it to Child, and how to interact with Child in general. *Id.* at 26. She reported that Father spent much of his time at visits "focusing on [F]acetiming and talking to [M]other versus actually trying to bond or interact with [Child]." *Id.* However, Ms. Rhoads conceded that Father had only five visits with Child before they were suspended due to the goal change order in April of 2021. *Id.* at 19, 31. She also stated that she received reports expressing concern about Father's parenting skills on two of those visits, but she was "not sure" if those concerns existed during Father's other visits. *Id.* at 31. At the two visits where Father struggled, Ms. Rhoads added that Father was able to improve "with the help of continued coaching and reminders." *Id.* at 31-32.

Ms. Rhoads also testified regarding the suspension of Father's visits with Child. She noted that Father's last visit with Child was on May 4, 2021. *Id.* To Ms. Rhoads' knowledge, Father had no other form of contact with Child beyond supervised visits. *Id.* at 20. However, even if Father did have some form of contact with Child other than visits, Ms. Rhoads agreed that contact "would not have any import to [Child]," given that Child was about six months old at the time of the hearing. *Id.*

Ms. Rhoads concluded that Child did not have any parental bond with Father. *Id.* In contrast, she testified Child was "very bonded" with his foster family. *Id.* at 21. Ms. Rhoads explained Child "follows their voices and turns

his body to see them any chance that they move out of his sight. He also smiles and does the babbling and cooing with them in the sense of he is excited and feels safe around them." *Id.*

Both Mother and Father testified on their own behalf. Relevant to this appeal, Father testified that he does not have a drinking problem and denied the alcohol-related allegations resulting in Child's placement. *Id.* at 42-43, 47-48. Father also insisted that CYF did not offer him services of any kind, including an in-home team or a parenting capacity assessment. *Id.* at 43-44. At the conclusion of the hearing, the trial court terminated Father's parental rights.

On appeal, Father claims that CYF failed to present sufficient evidence supporting termination under Section 2511(a)(2). Father's Brief at 18. Father argues that because Section 2511(a) focuses on parental conduct, the trial court's order changing Child's concurrent goal and ending reunification services proscribed his ability to remedy his parental incapacity. *Id.* at 21. Father emphasizes that the trial court's goal change order was later reversed on appeal. *Id.* Further, Father notes that both the in-home team and his visitation with Child were terminated after just twenty-two days. *Id.* at 20. Finally, regarding CYF's concern that he is still in a relationship with Mother, Father maintains that the record does not establish how that relationship is relevant to the grounds for termination pursuant to Section 2511(a)(2). *Id.* at 22.

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We

have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (citation omitted).

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b) . . . .

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we "may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." *In re M.T.*, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*) (citation omitted).

Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 13 -

23 Pa.C.S. § 2511(a)(2).

> To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations omitted).

> Further, this Court has explained:
>
> The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are "not limited to affirmative misconduct."
>
>> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.
>
> Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous."

*In re Z.P.*, 994 A.2d 1108, 1117-1118 (Pa. Super. 2010) (citations and emphasis omitted).

An agency is not required to provide reunification services when a child's permanency goal is changed from reunification. *See T.S.M.*, 71 A.3d at 261 n.22.

Further, our Supreme Court has explained:

Neither subsection [of Section 2511] requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights. Nevertheless, this Court has observed that the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child. For example, as applicable to subsection (a)(2), a court may find an agency's lack of assistance to a parent relevant to whether a parent's incapacity "cannot or will not be remedied by the parent."

*In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014) (citations omitted).

Here, in its Rule 1925(a) opinion, the trial court explained:

In regards to [Section] 2511(a)(2), it is clear from the record that CYF offered clear and convincing evidence that incapacity, abuse, neglect or refusal by the Father has caused [Child] to be without essential parental care necessary for [his] mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal will not be remedied by the parent. Father's alcohol use is one of the concerns relating to incapacity to care for [Child] that Father has not remedied. On the day of Child's birth, Father appeared to be intoxicated at the hospital when Mother was admitted to give birth. He appeared to pass out and Child was removed from him and returned to the NICU. He was escorted out of the hospital for the remainder of Mother and Child's stay. [CYF] referred Father for alcohol testing through Families United Network. Father had a BAC of 0.335 at the first test on April 6, 2021. From April 7, 2021 until September 17, 2021, Father tested positive for alcohol four times, refused to provide a specimen six times, and was unavailable for testing thirty-three times. He

tested negative three times.  Yet, at the Termination of Parental Rights Hearing, when Father was asked whether he had a drinking problem, he claimed not to know that this was a concern of [CYF].

*     *     *

The [c]ourt did not find Father's testimony credible.  At the hearing on April 7, 2021, a caseworker testified to speaking with Father about [CYF's] concerns regarding alcohol as well as other issues.

*     *     *

Father's alcohol usage was one of the issues necessitating the original placement.  Father has not remedied his alcohol usage sufficient to support reunification.  CYF has provided sufficient evidence under [Section] 2511(a)(2) that Father's incapacity, abuse, neglect or refusal has caused the child to be without essential parental care necessary for her mental well-being and the conditions and causes of the abuse, neglect and refusal will not be remedied by Father.

Trial Ct. Op. at 10-12 (citations to the record omitted).

Initially, we observe that in its opinion, the trial court relied primarily, if not entirely, on Father's ongoing alcohol abuse to conclude that he was incapable of parenting Child.  Indeed, the record confirms that Father engaged in excessive alcohol use at the time Child entered foster care, and that Father's alcohol use remained a concern at the time of the termination hearing.  However, CYF also presented other evidence of Father's parental incapacity, including his reportedly marginal parenting skills and his decision to remain in a relationship with Mother, despite the court's finding of aggravated circumstances against her.  Further, we find that Father's relationship with Mother is particularly concerning due to her lengthy history with CYF and the fact that the court had recently terminated her parental rights to seven other

children. Indeed, in its prior goal change order, the court noted that Father had told CYF "that he plans to marry Mother, and if he has to choose between her and the child, he will choose the mother." Permanency Review Order – Amended, 6/10/21, at 1. Therefore, we find no error in the trial court's conclusion that Father is incapable of parenting Child, and that his repeated parental incapacity has caused Child to be without essential care. *See* 23 Pa.C.S. § 2511(a)(2).

However, Section 2511(a)(2) also requires proof that a parent's incapacity "cannot or will not be remedied." *See* 23 Pa.C.S. § 2511(a)(2). Again, we recognize that an agency is not required to provide reunification services when a child's permanency goal is changed from reunification. *See T.S.M.*, 71 A.3d at 261 n.22. Under the specific circumstances of this case, we conclude that the absence of reasonable efforts by CYF are a significant consideration. *See Interest of T.M.W.*, 232 A.3d 937, 950 (Pa. Super. 2020) (finding that the agency's lack of assistance was "determinative in our conclusion that the evidence was not 'so clear, direct, weighty, and convincing' to prove that . . . [the] causes of [the] mother's incapacity cannot or will not be remedied by her under [S]ection 2511(a)(2)"); *see also D.C.D.*, 105 A.3d at 672 (stating that "the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child").

Here, although Father had only been receiving services for twenty-two days at the time of the permanency review hearing, the record reflects that

Father had made progress towards his service plan by complying with alcohol testing, completing his intake for intensive family services, and attending all but one weekly visit with Child. *See K.C.*, 2021 WL 5409988 at *7 (stating that there was no dispute that Father "acted affirmatively by getting alcohol screens, attending supervised visits with Child, and completing intake with Pressley Ridge family services"). Indeed, CYF caseworker Ms. Rhoads recommended that Child remain in his current placement and that Father "continue to work with all of the outlined services." *See* N.T. Goal Change Hr'g at 12. However, the trial court concluded that "quite frankly, there is virtually zero chance that Father is going to be able to do anything to make this reunification happen."[7] *Id.* at 21.

After the trial court issued the goal change order, CYF was no longer required to provide agency services or facilitate Father's visits with Child. At the time of the termination hearing in September of 2021, Father continued to struggle with alcohol use, had failed to complete a parenting assessment, and was still living with Mother.

There is no question that parents often suffer from parental incapacities at the time their children enter foster care. This, of course, is the point of offering parents reunification services – to assist them in overcoming

---

[7] Similarly, Child's GAL remarked that they had not "had a lot of time since the last hearing." *See* N.T. Goal Change Hr'g at 12. She then stated: "I know the agency is in the process of filing for a termination of parental rights anyways. So I know the case is going to move forward. I am not sure on his behalf if I have a strong position either way . . . ." *Id.*

whatever has rendered them incapable of caring for their child. Reunification services also provide a clarifying function. ***See In re Interest of C.K.***, 165 A.3d 935, 944 (Pa. Super. 2017) (stating that "[a]ssisting parents with achieving the Juvenile Act's goal of family unity in a timely fashion ultimately benefits children, as it will result either in a successful safe reunification or a clearer picture of the parents' inability to remedy the conditions causing the child to be out of their care").

Under the circumstances of this case, we conclude that the trial court's precipitous termination of reunification services denied the court the benefit of this clarifying function. Although Father struggles with alcohol use, has marginal parenting skills, and continues to maintain a relationship with Mother, it is possible that reunification services could assist Father with overcoming these issues in the future. In other words, given the lack of information about Father's efforts towards reunification, we are unable to conclude that Father's incapacity cannot or will not be remedied. ***See*** 23 Pa.C.S. § 2511(a)(2); ***see also C.M.K.***, 203 A.3d at 262. Because the court erroneously deprived Father of agency services, it had no way to determine whether Father could not or would not remedy his parental incapacity in a reasonable time.[8] ***See C.K.***, 165 A.3d at 944.

_____

[8] We acknowledge that the trial court's goal change order provided that "a parenting capacity assessment and drug and alcohol evaluation may still remain in place." Permanency Review Order – Amended, 6/10/21, at 4. However, our review of the record confirms that the only assistance CYF may
*(Footnote Continued Next Page)*

Further, under these circumstances, we conclude that **D.C.D.** does not require that we acquiesce to the absence of reunification services in this case. **See D.C.D.**, 105 A.3d at 672; **see also T.M.W.**, 232 A.3d at 950. Just as a child welfare agency cannot deprive an incarcerated parent of services and then support termination by pointing to the resulting erosion of the parent-child bond, **see D.C.D.**, 105 A.3d at 672, the trial court in this case could not improperly deprive Father of services and then point to Father's lack of immediate progress to support termination of his parental rights less than six months after Child entered foster care. To conclude otherwise would be to turn a blind eye to principles of basic fairness and to this Court's prior decision reversing the trial court's goal change order.[9] **See K.C.**, 2021 WL 5409988 at *7.

_____

have provided to Father after the goal change order was in referring him for a parenting capacity assessment, which was scheduled for July 2021. N.T. 9/17/21, at 16. Given that Father was denied any opportunity to visit with Child after May of 2021, we fail to see how that assessment would have aided Father in reaching his reunification goals.

[9] In reaching our decision, we emphasize that this is not a case where there was a finding of aggravated circumstances as to Father or where the trial court discontinued services in a goal change order after providing services for an extended period. **See** 42 Pa.C.S. § 6351; **see also In re R.J.T.**, 9 A.3d 1179 (noting that "the record could have supported a goal change to adoption, as [the c]hild had been in custody for an extended period and [his p]arents had not attained the goals of their [service plan] at the time of the permanency hearing").

Accordingly, because we conclude that the record does not support the trial court's decision to terminate Father's parental rights to Child involuntarily under Section 2511(a)(2), we reverse the September 17, 2021 decree.

Decree reversed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/25/2022